IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. CR09-3044 |
| vs. | ORDER FOR PSYCHOLOGICAL OR PSYCHIATRIC EXAMINATION |
| BARBARA ANN KRAUTH, | |
| Defendant. | |

On the 29th day of January 2010, this matter came on for hearing on the Motion for Psychological or Psychiatric Examination (docket number 13) filed by the Government on January 22, 2010. The Government was represented by Assistant United States Attorney Rebecca Goodgame Ebinger. The Defendant, Barbara Ann Krauth, appeared personally and was represented by her attorney, Jane Kelly.

## I. PROCEDURAL BACKGROUND

On December 8, 2009, Defendant was charged by Indictment (docket number 2) with possession of a forged security (Count 1), unauthorized use of an "access device" (Count 2), and aggravated identity theft (Count 3). The events giving rise to the charges allegedly occurred between February 22, 2005 and February 22, 2006. Defendant entered a plea of not guilty and trial is scheduled before Chief Judge Linda R. Reade on February 16, 2010.

On January 13, 2010, Defendant timely filed a notice (docket number 10) indicating that "she may assert a defense of insanity at the time of the alleged offenses." On the same date, Defendant filed a motion (docket number 9) seeking a hearing to determine her mental competency, pursuant to 18 U.S.C. section 4241(a). With its instant motion for psychological or psychiatric examination, the Government responded to Defendant's

1

motion, stating that it does not resist Defendant's request for a competency hearing. *See* docket number 13.

Prior to any competency hearing, however, the Government asks that Defendant be required to undergo a psychiatric or psychological examination pursuant to section 4241(b). The Government also notes that since Defendant has given notice of her intention to assert a defense of insanity, the Court must, upon the Government's motion, order Defendant examined pursuant to section 4242(a). *See* FED. R. CRIM. P. 12.2(c)(1)(B). In her resistance to the instant motion, Defendant "concedes that an examination must be ordered."

The fighting issue, however, is whether the examination under sections 4241(b) and 4242(a) should be "in-custody" or "out-of-custody." Section 4247(b) provides the Court "may" commit a person to the custody of the attorney general for this purpose. Noting that she is currently on pretrial release and does not pose any danger to the community, or of nonappearance, Defendant asks that the examination be conducted on an out-of-custody basis. The Government contends that "an in-custody evaluation, completed by Bureau of Prisons Psychiatrists or Psychologists who routinely evaluate individuals based upon the statutory criteria required, would provide the most efficient, thorough, and reliable means of providing the Court with the necessary information to make a determination as to the Defendant's competency to stand trial."

## II. RELEVANT FACTS

Defendant resides in Waseca, Minnesota, with her fiancé, Jess Paulson. Paulson is also Defendant's guardian, conservator, and representative payee for Social Security benefits. *See* Defendant's Exhibit A. Following the return of the instant Indictment, Defendant was summoned to appear in Cedar Rapids for an initial appearance. The Government did not seek Defendant's detention prior to trial, and Defendant was ordered to comply with certain conditions of release. There is no evidence that Defendant has

failed to comply with those conditions, and the Government does not argue that she is a risk of flight or a danger to the community.

Pamela Little, a clinical social worker in Mason City, Iowa, testified regarding Defendant's mental health status. Ms. Little testified that she has treated Defendant "fairly continuously" since August 2006. According to Ms. Little, Defendant was referred to her at that time after making a false missing child report. Apparently, Defendant had left her child in the care of a third party, but suffered from blackouts, hallucinations, and disorientation, resulting in a false report that her child was missing. Defendant suffered from extreme anxiety and, according to Ms. Little, "trembled like a leaf" when they first met.

Ms. Little diagnosed Defendant as suffering from post-traumatic stress disorder. She saw Defendant "at least weekly" initially. In November 2006, Defendant was hospitalized due to "suicidal depression." The visits then "stretched out" and Ms. Little testified that it took Defendant a year before she was comfortable enough to talk about hearing voices and other serious psychiatric symptoms.

While Ms. Little was not sure of the date, she believes Defendant moved to Minnesota in 2007. Since that time, Defendant has been working with a nurse specialist, whom Defendant refers to as "Dr. Sam." According to Ms. Little, Dr. Sam has gained Defendant's trust and monitors her medications. In addition, however, Defendant travels to Mason City nearly weekly to meet with Ms. Little.[1]

Ms. Little testified that this is a "very complex case." According to Ms. Little, Defendant is bipolar and also suffers from schizophrenia, depression, and "crippling anxiety." In her statement signed on August 27, 2009 in the guardianship/conservatorship proceeding, Ms. Little gave the following "diagnostic impression and description":

> Major depression, severe, including suicide attempt and hospitalization within past month; post-traumatic stress

---

[1] According to Goggle Maps, the distance from Waseca to Mason City is approximately 87 miles.

3

disorder with triggers resulting in a temporary breakdown of current functioning; schizophrenia with hallucinations, flat affect; bipolar.

See Statement in Support of Guardianship/Conservatorship, Defendant's Exhibit A at 12.

Samantha Huguelet,[2] a licensed clinical nurse specialist, provided a statement in support of the guardianship/conservatorship which included the following diagnostic impression and description:

> Schizo affective D/O[;] mood D/O and Psychosis Post-Traumatic Stress D/O – from past sexual abuse/rape, physical abuse in relationships. family of origin is re-abusing her w/ every phone call & threat

Id. at 13.

Regarding "behavioral evidence to support petition for the appointment of a guardian or a conservator, Ms. Huguelet wrote:

> Active hallucinations and paranoia. Pt has [illegible] reality testing problems – unable to tell what is real or not real. Also has cognitive thought process delays and confusion.

Id.

### III. DISCUSSION

Defendant concedes that the Government is entitled to have her examined to determine whether she is competent to stand trial, and to assess her sanity when the events giving rise to the instant charges occurred in 2005 and 2006. It is also undisputed that the Court *may* commit Defendant to the custody of the attorney general for placement in a suitable facility for that purpose. However, the Court is not *required* to commit Defendant for this purpose. While the statutory language commands the Court to order an examination under these circumstances, if the Court believes "that the defendant's examination can be conducted on an outpatient basis, there need not be a commitment

---

[2] The Court suspects that Ms. Huguelet is the "Dr. Sam" referred to at the time of hearing.

under this provision." *In re Newchurch*, 807 F.2d 404, 410 (5th Cir. 1986) (quoting the legislative history to section 4247(b)).

In support of its argument that an in-custody examination is required, the Government offered the testimony of Dr. Paul Sahwell, chief of the psychological evaluations section for the Bureau of Prisons. Dr. Sahwell described a three-step process for conducting competency and sanity examinations. The first step consists of an "initial review." During this process, the evaluator will review the court order, contact the attorneys, assess the person's medical condition, review the person's mental health history and medications, and conduct a face-to-face interview of the person.

The second stage of the evaluation consists of an "ongoing assessment." Generally, the evaluator will interview the person between two and ten times. The evaluator will also collect "collateral information," including law enforcement records, medical and mental health records, educational records, military records, criminal history, and information from attorneys, employers, and family. Also, psychological testing could be conducted. In addition, the person can be observed at meal times, during recreation, and interacting with staff and other inmates.

The third step of the evaluation is preparation of a report to the court. Dr. Sahwell estimated that it takes 30-45 "man-hours" to complete an evaluation, including preparation of the report.

According to Dr. Sahwell, the majority of the evaluations are conducted at metropolitan detention centers. Not all of the facilities have the capacity to evaluate women. MCC Chicago has a small female unit, but due to recent personnel changes, it is unlikely that Defendant would be assigned to Chicago. Other BOP facilities providing pretrial evaluations of women are located in Los Angeles, Miami, New York, San Diego, Seattle-Tacoma, and Carswell, Texas. Placement is determined by considering the person's gender, security level, other medical problems, and availability of space at the facility.

In support of its position, the Government cites *United States v. Deters*, 143 F.3d 577 (10th Cir. 1998). There, the Court concluded that the defendant was properly committed for the purpose of conducting an examination for competency and sanity. Citing *Newchurch*, the Court noted that detention is permissible if it "is reasonably necessary to assure [the accused's] presence at trial or to protect some other important governmental interest." *Id.* at 583. The district court in *Deters* "identified at least two 'sufficiently compelling' reasons to justify detaining the defendant during her examination." *Id.*

The first concern expressed by the district court in *Deters* was that "an outpatient exam presented the risk that the defendant would not appear for trial." *Id.* at 583-84. The defendant was living in California, while facing trial in Kansas. Her living conditions in California were "unstable." Given the defendant's circumstances, she "may have been unable to return to Kansas, even if she desired to do so." *Id.* at 584. The "transitory nature of the defendant's living conditions" complicated any attempts to contact or locate her in California. *Id.*

In the instant action, however, Defendant is living with her fiancé in Waseca, Minnesota. According to the testimony, Defendant has a "support system" which includes her fiancé, his family, her pastor, and friends. Defendant appeared in Cedar Rapids when summoned for an initial appearance, and has returned to Cedar Rapids when required since that time (for a status hearing and for hearing on the instant motion).[3] There is no evidence that Defendant is a risk of flight and, indeed, the Government does not make that argument.

The second "sufficiently compelling" reason identified by the district court in justifying the defendant's commitment in *Deters* was the government's interest in a speedy trial. In *Deters*, almost 300 days had passed since the filing of the indictment. The

---

[3] According to Google Maps, the distance from Waseca to Cedar Rapids is approximately 173 miles.

6

defendant raised the issue of psychiatric examinations "late in the proceedings." *Id*. The court concluded that granting the defendant's original request – which was for a continuance to obtain a psychological examination from a doctor in California – could have led to further delay. This would likely have resulted in the prosecution requesting "a re-examination with a doctor more familiar to the prosecution." *Id*. According to the Tenth Circuit Court of Appeals, "[t]he district court knew that it could avoid this potential delay by ordering the examinations itself and ordering that they be performed by doctors in the federal facilities, whose impartiality and qualifications were less likely to be questioned by either side." *Id*.

In the instant action, Defendant has not delayed in raising the issues of competency and sanity. The motion seeking a hearing to determine her mental competency, and the notice indicating that she may assert a defense of insanity, were filed just 28 days following her initial appearance, in compliance with the Court's trial management Order. There is no evidence that an out-of-custody examination would unduly delay the prosecution of this case. Indeed, it is more likely that an in-custody examination would take longer.[4]

According to Dr. Sahwell, an in-custody examination and out-of-custody examination are similar in many ways. During the initial review, the evaluator examines the court order and speaks with the lawyers. The evaluator reviews the person's medical history and mental health history, including medications. The evaluator then conducts a face-to-face interview with the defendant. All of these tasks can be accomplished whether the defendant is in custody or out-of-custody.

---

[4] Commitment for a competency examination pursuant to section 4241(b) may not exceed 30 days, but the director of the facility may apply for a reasonable extension, not to exceed an additional 15 days. A sanity examination pursuant to section 4242(a) may not exceed 45 days, although it may be extended for an additional 30 days upon application of the director of the facility. Those time limitations do not include travel to and from the facility. Accordingly, Defendant's commitment for an in-custody section 4242(a) examination could easily exceed 90 days.

7

The second step of the evaluation consists of additional interviews with the person, psychological testing, and a review of "collateral information." Again, these tasks can be accomplished whether the person is in custody or out-of-custody.

It would appear that the only significant difference between an in-custody evaluation and an out-of-custody evaluation is the ability to observe a person on a fairly continuous basis over an extended period. That is, if a person is committed for an in-custody examination, then the evaluator is able to observe the person's interaction with staff and other inmates while eating, recreating, and passing the day.

The Court recognizes that by its nature, an in-custody evaluation is likely to be more comprehensive than an out-of-custody evaluation. If commitment to the attorney general was justified on that fact alone, however, then there would never be an out-of-custody evaluation.

> It is probably always the case that a 30 day commitment for purpose of preparing a mental competency report under § 4247 would produce a more comprehensive report. The United States has not demonstrated, however, that there is some specific reason why an adequate evaluation of Defendant cannot occur here in Tulsa.

*United States v. Weed*, 184 F. Supp. 2d 1166, 1172 (N.D. Okla. 2002).

Citing Defendant's criminal record, the Government argues that "[t]his history of deceit makes the potential for malingering of great concern."[5] The possibility of malingering is always present, however, and presumably addressed by a competent examiner. The Court does not believe that the facts in this case make the possibility of malingering any more, or less, likely. (Defendant argues that the longstanding nature of her symptoms cuts against the likelihood of malingering.)

Defendant argues that it is also fair to consider the psychological damage which may be inflicted by an in-custody examination. Ms. Little opined that Defendant would be

---

[5] Defendant has been convicted of issuing a dishonored check, financial transaction card fraud, offering a forged check, and misdemeanor identity theft. *See* Government's Exhibits 1-4.

8

distrustful and overly stressed during an in-custody evaluation, which would result in "unnecessarily skewed data." Ms. Little conceded, however, that even an outpatient evaluation would be difficult for Defendant. Ms. Little testified that she feared Defendant would "shut down" without her support system, resulting in a "mental collapse."

The Government did not offer any evidence suggesting that there are no competent medical professionals who could conduct an out-of-custody forensic psychological or psychiatric examination of Defendant. The Court notes that Defendant lives within driving distance to Rochester, Minnesota (a well-known medical center), and Minneapolis (a major metropolitan area).[6] The Court assumes that there are qualified and experienced medical professionals who can be found for this purpose.

As noted above, Defendant is currently on pretrial release. The Court is sensitive to the argument that she should not lose her freedom simply by raising the issues of competency and sanity. *See United States v. Gomez-Borges*, 91 F. Supp. 2d 477, 478 (D.P.R. 2000). If a valid examination can be conducted by an expert of the Government's choosing on an out-of-custody basis, then the Court believes that is the preferable alternative.

> Read together, the provision that the court "may" commit a person to the custody of the Attorney General, the legislative statement that commitment should not be ordered if the examination can be conducted on an outpatient basis, and the provision that, if the defendant is committed, he shall be examined in the nearest suitable facility, all require that, before committing a defendant, the court determine, on the basis of evidence submitted by the government, subject to cross examination, and to rebuttal by the defendant, that the government cannot adequately prepare for trial on the insanity issue by having the defendant examined as an outpatient.

*In re Newchurch*, 807 F.2d at 411.

---

[6] According to Google Maps, the distance from Waseca to Rochester is approximately 57 miles, and the distance from Waseca to Minneapolis is approximately 77 miles.

Doctor Sahwell conceded that valid forensic examinations may be conducted on an out-of-custody basis. Here, it is likely that the Government can locate, within driving distance of Defendant's home, a qualified psychologist or psychiatrist to conduct a forensic examination. If Defendant were committed for this purpose, it would likely require that she be sent to the east coast, west coast, or Texas, and removed from her home for 90 days or more. After carefully considering the parties' respective arguments, the Court concludes that the examination may be conducted on an out-of-custody basis.

## ORDER

IT IS THEREFORE ORDERED that the Motion for Psychological or Psychiatric Examination (docket number 13) filed by the Government on January 22, 2010 is hereby **GRANTED** as follows:

1. Pursuant to 18 U.S.C. §§ 4241(b), 4242(a), and 4247(b), a psychiatric or psychological examination of Defendant shall be conducted on an out-of-custody basis by a licensed or certified psychiatrist or psychologist of the Government's choosing.

2. Defendant shall cooperate fully in the examination and shall report on the dates and at the times designated for that purpose.

3. Pursuant to 18 U.S.C. § 4247(c), a psychiatric or psychological report shall be filed with the Court, with copies provided to counsel, which shall include the following:

   a. the Defendant's history and present symptoms;

   b. a description of the psychiatric, psychological, and medical tests that were employed and their results;

   c. the examiner's findings;

   d. the examiner's opinions as to diagnosis, prognosis, and whether Defendant is suffering from a mental disease or defect rendering her mentally incompetent to the extent that she is unable to understand the nature and consequences of the proceedings against her or to assist properly in her defense; and

e. the examiner's opinion regarding whether Defendant was insane at the time of the offense charged.

DATED this 2nd day of February, 2010.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA